## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

HAL DUNCAN and MARSHA DUNCAN,

        Plaintiffs,

v.

WELLS FARGO BANK, N.A.; THE BANK
OF NEW YORK MELLON CORPORATION;
and PERSHING LLC,

        Defendants.

CASE NO. _____

**JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

Plaintiffs, Hal Duncan and Marsha Duncan (the "Duncans"), by and through undersigned counsel, hereby bring this action against Defendants, Wells Fargo Bank, N.A. ("Wells Fargo"), The Bank of New York Mellon Corporation, doing business as BNY Mellon ("BNY Mellon" or "BNY"), and Pershing LLC ("Pershing"), for negligence, carelessness, recklessness, gross recklessness, negligent misrepresentation, breach of fiduciary duty and for violations of consumer protection laws as well as the Electronic Fund Transfer Act of 1978, 15 U.S.C. § 1693, *et seq.* ("EFTA") and Regulation E, Subpart B. This action also results from violations of the Uniform Commercial Code ("UCC"), Article 4, as well as UCC Article 4A and its state analogues under ALA. CODE § 7-4A-101 (1975) *et seq.*; CAL. COM. CODE § 11101 (1990) *et seq.*; DEL. CODE ANN. TIT. 6. § 4A-1-101 (1992) *et seq.*; N.J. STAT. ANN. §12A:4A-101 (1994) *et seq.*; N.Y.U.C.C. § 4-A-101 (2014) *et seq.*; and S.D. CODIFIED LAWS § 57A-4A-101 (1991) *et seq.* Both Wells Fargo and BNY Mellon could have prevented the fraud alleged herein had either implemented proper and/or adequate procedures to protect the risk to its customers and potential customers. Both Defendants failed to adhere to banking industry standards or United States Department of Treasury guidelines, while also failing to follow their own internal standards, policies and procedures. This

1

action arises out of a fraudulent investment transaction, resulting from the "website spoofing" of the BNY Mellon and facilitated by the acts and/or omissions of Wells Fargo. The Duncans suffered a substantial financial loss, which would not have occurred had Defendants exercised due care and followed the law, industry standards, recommendations of the United States Government and their own internal guidance, policies and procedures, as more fully set out herein.

## PARTIES

1.     The Duncans are citizens and residents of the State of Alabama, residing in Elberta, Baldwin County, Alabama.

2.     BNY Mellon is a banking corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 225 Liberty Street, New York, New York 10286.

3.     Pershing, a subsidiary of BNY Mellon, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at One Pershing Plaza, Jersey City, New Jersey 07399.  For purposes of this Complaint, the term "BNY Mellon," absent further specification, shall encompass both BNY Mellon and Pershing.

4.     Wells Fargo is a national banking association organized under and existing under the laws of the United States, pursuant to 12 U.S.C.A § 21, with its main office at 101 North Phillips Avenue, Sioux Falls, South Dakota 57104, and principal executive offices at 420 Montgomery Street, San Francisco, California 94104.

5.     In 2002, the Duncans opened an account with Wachovia National Bank ("Wachovia") in New Jersey.  In or about 2009, Wachovia was acquired by Wells Fargo.  The Duncans' account was then administered by Wells Fargo without the Duncans executing a new account agreement.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and there is complete diversity.  Plaintiffs are citizens of Alabama and Defendants are either domiciled, incorporated or otherwise maintain their principal places of business in South Dakota, California, New York, New Jersey and/or Delaware.

7.     This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367.  The Court has federal question jurisdiction over Plaintiffs' EFTA claims, *see* 15 U.S.C. § 1693m, and has supplemental jurisdiction over Plaintiffs' remaining claims, which arise from the same case or controversy.

8.     This Court has personal jurisdiction over each Defendant. BNY Mellon maintains its principal place of business in New York.  Wells Fargo owns and operates numerous branches in New York, specifies that New York law governs all of its remittance transfers (including the one at issue herein), and otherwise maintains continuous, systematic, and uniquely substantial affiliations with New York.

9.     Venue is proper in this District because Defendants are subject to personal jurisdiction in this District and BNY Mellon resides in this District for venue purposes, pursuant to 28 U.S.C. § 1391.

## BACKGROUND

10.     According to the Federal Bureau of Investigation (FBI), cyber-initiated wire fraud is a $12 Billion industry and continues to grow at an alarming rate—at least thirtyfold since 2015. FBI Public Service Announcement (PSA), *Business E-mail Compromise E-mail Account Compromise The 5 Billion Dollar Scam* (May 4, 2017) (Exhibit A); FBI PSA, Business *E-mail*

*Compromise The 12 Billion Dollar Scam* (July 12, 2018) (Exhibit B).

11.    According to the FBI, in a typical scenario of such cyber-initiated wire fraud, the fraud's perpetrator creates a "spoofed" website which appears to be a website of the legitimate entity with which the victim is seeking to do business, possibly with very subtle differences.

12.    Unsuspecting targets are lured in by the "spoofed" website and induced into financial transactions, supposedly with the known, legitimate entity represented on the website. Unbeknownst to them, they are actually engaging with a fraudulent individual or entity.  *See* FBI PSAs (Exhibits A-B).

13.    Typically, the victim is directed to send funds via wire transfer to an account supposedly belonging to the legitimate entity, but in fact belonging to the fraud's perpetrator, who then absconds with the funds. *See* FBI PSAs (Exhibits A-B).

14.    According to Wells Fargo's website, roughly $2.3 billion was lost to wire transfer fraud between October 2013 and February 2016.    https://www.wellsfargo.com/financial-education/basic-finances/manage-money/payments/safety-tips-wire-transfers/ (Exhibit C).

15.    The FBI has since come out with a more recent statistic which states that between October 2013 and May 2018, cyber-initiated wire fraud claimed 41,058 victims and losses have increased to approximately $3 Billion in the United States alone. (Exhibit B).

16.    Research has revealed that the four top U.S. institutions caught up in phishing scams were Bank of America, *Wells Fargo*, US Bank and TD Bank. *See How Scammers Phish for Customer Data with Spoofed Banking Sites*, https://www.cutimes.com/2018/06/13/how-scammers-phish-for-customer-data-with-spoofed/ (Exhibit D).

17.    Cyber-initiated wire fraud through the use of spoofed bank websites is well known in the financial community and is well known or should have been well known to the Defendants

for many years prior to the incident complained of.

18.    The Defendants have established security departments with significant personnel whose job functions include to identify frauds and fraudulent activities; identify the purchase or existence of URLs or website domains that spoof or mimic the URLs or website domains of their financial institutions, but which are not owned by their financial institutions; identify the existence of spoofed bank websites trading on the name of their financial institutions, but which are not owned by their financial institutions; and prevent the customers and potential customers of their employer institutions from becoming victims of cyber-initiated fraud, including victimization resulting from spoofing of these institutions' websites.

19.    Some of the security personnel employed by the Defendants were previously employed by the Federal Bureau of Investigation (FBI) and/or the U.S. Department of the Treasury (Treasury) as Special Agents and in other capacities, whose job functions at the Defendants include the responsibility to identify frauds and fraudulent activities; identify the purchase or existence of URLs or website domains that spoof or mimic the URLs or website domains of their financial institutions, but which are not owned by their financial institutions; identify the existence of spoofed bank websites trading on the name of their financial institutions, but which are not owned by their financial institutions; and prevent the customers and potential customers of their employer institutions from becoming victims of cyber-initiated fraud, including victimization resulting from spoofing of these institutions' websites.

## FACTUAL ALLEGATIONS

20.    In 2018, the Duncans, who had recently retired and relocated from New Jersey to Alabama, sought out a safe, secure, short term, and insured banking investment in which to invest a significant part of the cash that they had saved for their retirement, totaling $650,000.

21.     On April 9, 2018, Marsha Duncan performed an internet search for jumbo CD rates. The very first result of that internet search, after "CNN" and "CNNmoney", was the URL (also known as "website domain") "bnymelloncdrates.com".  The anchor text associated with that search result for reflecting the URL "bnymelloncdrates.com" stated, "1 Year FDIC CD 2.32%-3.03% APY – Maxi…."  Duncan Search History, April 9 2018. (Exhibit E).

22.     From all appearances, this URL was a legitimate URL of Defendant BNY Mellon.

23.     When the Duncans clicked on the URL and were sent to the website, the website was, from all appearances, a legitimate website of Defendant BNY Mellon.

24.     After navigating to the website "bnymelloncdrates.com", Mrs. Duncan called the phone number listed on the site, first speaking with a receptionist who answered the phone in the name of BNY Mellon.  Mrs. Duncan was then transferred to a man who introduced and identified himself as "Barry Drucker," claiming to be a Senior Account Executive with BNY Mellon.

25.     As the Duncans later learned, there was in fact an employee of BNY Mellon with the name Barry Drucker, who was Managing Director of BNY Mellon subsidiary BNY Mellon Capital Markets, LLC.

26.     The man who identified himself as "Barry Drucker" quoted the Duncans a Certificate of Deposit that had an APR of 2.70% to 2.73%.

27.     The Duncans inquired of the man who identified himself as "Barry Drucker" as to why BNY Mellon was offering such a high rate of interest on a 1-year CD.

28.     The Duncans were unaware of any bank in the United States offering such a rate of interest on a 1-year CD, as the rate generally being offered for similar instruments was approximately one-half that rate.

29.     The man who identified himself as "Barry Drucker" indicated that the 2.73%

6

interest rate was reserved for high net-worth clients.

30.     The fraudster further indicated that this was because BNY Mellon had recently opened an office in China and the pool of clients they had was now much larger than it had been previously.

31.     At that particular time, the Duncans were earning 1.5% on a savings account held at Barclays and were also earning 0.5% on a Wells Fargo Platinum savings account.

32.     These rates were considerably lower than the rate that was allegedly being offered by BNY Mellon.

33.     The then current market rate for a 1-year CD at most financial institutions in the United States was approximately 1.5%.

34.     Following his call with Mrs. Duncan, the man identifying himself as "Barry Drucker" emailed the Duncans an investment packet composed of various documents bearing the name and trademark of BNY Mellon/Pershing — documents which appeared to come from Defendant BNY Mellon and to comprise a valid offer to the Duncans to purchase a certificate of deposit on the stated terms. *See, e.g.*, Term Sheet (Exhibit F); Single/Joint Account Application (Exhibit G); BNY Mellon "At a Glance," 4Q17 (Exhibit H).

35.     Accompanying these materials were wire transfer instructions, which directed the investment funds to be sent to the account of BNY/Pershing clearinghouse "Pershing Clearing LLC, 1 Pershing Plaza, BNY Mellon Building, Jersey City, NJ 07399." *See* Wire Instructions (Exhibit I).

36.     The materials that were provided to the Duncans also contained a contract number referenced "CD12HD2256988-Duncan."

37.     Two days later, on April 11, 2018, the Duncans went to their local Wells Fargo

branch in Foley, Alabama, intending to purchase the BNY Mellon/Pershing CD by wiring funds held in their Wells Fargo checking account, to "BNY/Pershing clearinghouse Pershing Clearing LLC, 1 Pershing Plaza, BNY Mellon Building, Jersey City, NJ 07399", as directed in the material received from "Barry Drucker". Wire Instructions (Exhibit I); Wells Fargo Checking Account Summary (Exhibit J).

38. The Duncans met with Wells Fargo employee Whitney Patterson ("Patterson") and gave Patterson all the information and materials they had received from the man who had identified himself as "Barry Drucker."

39. The Duncans were led to believe that the manager at the Wells Fargo branch was on vacation that day.

40. Patterson reviewed all of these materials in their entirety without further questioning the legitimacy of the transaction.

41. Patterson only asked Mr. Duncan several questions regarding a possible error in the address of the wiring instructions which was not readily apparent to Mr. Duncan and further questioned the Duncans to verify the Duncans' identity.

42. Patterson indicated to the Duncans that they do not make outgoing calls to verify the legitimacy of a wire transaction.

43. Noting that the transferee bank's SWIFT code indicated an overseas entity, Patterson consulted with another bank manager to assist with the transfer, stating that this was the largest international transaction Patterson had ever performed.

44. This was the first time that the Duncans had learned that their funds were going out of the country to a bank in Armenia.

45. Wiring funds to Armenia was a signal to Wells Fargo that this transaction was

8

highly suspect.

46.     Patterson advised the Duncans that the SWIFT code was giving her problems.

47.     At this time, Mr. Duncan called Barry Drucker directly on his cell phone to confirm the SWIFT number for Patterson.

48.     Mr. Duncan handed his cell phone to Patterson and stated: "Here, you speak to him," intending that Patterson and "Drucker" converse directly to resolve whatever hurdles were impeding the transfer.

49.     Patterson inquired of the man who identified himself as "Barry Drucker" about the APR on the forms which he had provided to the Duncans, which quoted an APR of 2.70% to 2.73%.

50.     Patterson inquired of the man who identified himself as "Barry Drucker" why BNY Mellon was offering such a high rate of interest on a 1-year CD.  Patterson then commented to the man who identified himself as "Barry Drucker" that she was unaware of any bank in the United States offering such a rate of interest on a 1-year CD, as the rate generally being offered for similar instruments was approximately one-half that rate.

51.     The man who identified himself as "Barry Drucker" indicated that the 2.73% interest rate was reserved for high net-worth clients.

52.     The fraudster further indicated that this was because BNY Mellon had recently opened an office in China and the pool of clients they had was now much larger than it had been previously.

53.     At that particular time, the Duncans were earning 1.5% on a savings account held at Barclays and were also earning 0.5% on a Wells Fargo Platinum savings account.

54.     These rates were considerably lower than the rate that was allegedly being offered

by BNY Mellon.

55.     This was another signal to Wells Fargo and Patterson that the transaction was highly suspect, as the current market rate for a 1-year CD was approximately half that rate.

56.     During her call with "Barry Drucker," Patterson sought to resolve the technical issues she had encountered and was provided a SWIFT code that differed slightly from that provided in the wire transfer instructions.[1]

57.     The man who identified himself as "Barry Drucker" also told Patterson that BNY Mellon does many transactions with Wells Fargo, and that Wells Fargo itself likewise uses clearing houses in Armenia.

58.     At no time did Patterson express any reservations or concerns to the Duncans regarding the identity of the man who identified himself as "Barry Drucker".

59.     At no time did Patterson express any reservations or concerns to the Duncans regarding the legitimacy of the transaction.

60.     At no time did Patterson state she thought the transaction was unusual or suspicious.

61.     At no time did Patterson call the real BNY Mellon to confirm that the contract number referenced: "CD12HD2256988-Duncan" was a valid contact number.

62.     At no time did Patterson call the real BNY Mellon to confirm that the transaction was a valid.

63.     At no time did Patterson call the real BNY Mellon to confirm that the wire to Pershing Clearing LLC in Armenia was a valid transaction to fund the purchase of a CD in the United States from BNY Mellon.

64.     If Patterson had expressed any reservations or concerns to the Duncans regarding

---

[1] Ultimately, it turned out that the SWIFT code provided on the wire transfer instructions was correct and "Barry Drucker's" "correction" was in error.

the identity of the man who identified himself as "Barry Drucker" or the legitimacy of the transaction, the Duncans never would have entered into the transaction and never would have wired the funds to the fraud's perpetrators.

65.    In any event, Patterson, following her conversation with the man identifying himself as "Barry Drucker," advised the Duncans they could not proceed with the transfer, as the funds in the Duncans' Wells Fargo checking account had not "cleared".

66.    Patterson was unable to complete the wire transfer that day because the funds that were transferred had to be cleared, as the Duncans had recently transferred funds from an outside Barclays account and another Wells Fargo account into the Wells Fargo checking account from which the transfer was to be made.

67.    Patterson had expressed that Wells Fargo wanted to rule out the possibility that the Duncans were engaging in a money laundering scheme and she explained that she was unable to perform the transaction as the funds had not yet cleared.

68.    The next day, on April 12, 2018, the Duncans returned to the Foley, Alabama, Wells Fargo branch, this time meeting with Wells Fargo employee Jennifer Peters ("Peters"), who they were led to believe was more senior than Whitney Patterson.

69.    Patterson was also working in her cubicle next to Jennifer Peters on April 12, 2018, but the Duncans financial concerns were handled by Peters.

70.    The Duncans again provided the background information and materials they had received from the man identifying himself as "Barry Drucker."

71.    Peters asked the Duncans questions about the BNY Mellon offer.

72.    Peters asked the Duncans how they received the offer.

73.    Peters commented she did not know how BNY Mellon was offering such a high

rate of interest.

74.    Peters was concerned that the Duncans had received the offer as a result of a telephone solicitation call.

75.    The Duncans informed Peters that they found out about the offer of the 1-year CD from a BNY Mellon website.

76.    The Duncans showed Peters the spoofed BNY Mellon URL and website on the Duncans' personal cell phone.

77.    However, Ms. Peters' office computer would not allow her access to the website containing the offer the Duncans' received.

78.    Peters attempt to access the spoofed website on her own Wells Fargo computer was futile, most likely, because of a Wells Fargo network firewall or other security technology preventing access to potentially dangerous and fraudulent websites on company computers.

79.    Upon information and belief, the office computer and/or browser software had security features preventing that bank office computer from going to spoofed websites.

80.    This was an additional indication the transaction was highly suspect.

81.    Upon information and belief, Peters' office computer attempting to visit a spoofed website would have displayed an alert to the effect that the user had navigated to a spoofed and/or potentially dangerous URL.

82.    Had Peters paid attention, she would likely have noticed a warning on her computer screen indicating that she was attempting to navigate to a potentially dangerous or fraudulent website, which would have given the Duncans notice of the potential fraudulent transaction and prevented the loss.

83.    To get around the firewall, Peters searched for the URL on her own personal cell

phone and, by this means, was able to view the spoofed BNY Mellon website.

84.     Peters then used her smartphone to navigate to the URL the Duncans had provided.

85.     Peters examined the spoofed BNY Mellon website on her personal cellphone and ultimately stated to the Duncans that everything appeared to be legitimate.

86.     The Duncans relied on this representation by Peters.

87.     This was only one of the few steps by which Peters took to confirm that the transaction was legitimate.

88.     Peters researched the name Barry Drucker and indicated to the Duncans that she thought Barry Drucker was a real person. Peters further stated that the Certificate of Deposit looked like a good and legitimate offer.

89.     The Duncans relied on this representation by Peters.

90.     The Duncans relied on the opinion of Jennifer Peters, a senior official at this branch of Wells Fargo, that the transaction was legitimate.

91.     At no time did Peters suggest she had any concern whatsoever concerning the transaction and the wiring of the funds as previously set forth.

92.     At no time did Peters suggest she should contact BNY Mellon or Pershing for any reason including to confirm the legitimacy of the transaction and the wire transfer.

93.     At no time did Peters contact the BNY Mellon or Pershing.

94.     Peters informed the Duncans that the wire would go *first* to an account with the name Pershing Clearing LLC in a bank *outside* the U.S. and then *back* into the clearing account with the name Pershing Clearing LLC *in* the United States, specifically Jersey City, NJ.

95.     Peters further stated the funds would then be immediately wired, in a matter of seconds, into the clearing account with the name Pershing Clearing LLC *in* the United States,

specifically Jersey City, NJ.

96.    The Duncans relied on the statements of Peters that the wire would go to a clearing account in the name Pershing Clearing LLC in both the first and second steps of the transaction.

97.    It was very important to the Duncans that the money at all times would be in accounts with the name Pershing Clearing LLC.

98.    Peters took no further steps to investigate the transaction.

99.    Peters failed to investigate the transaction despite her knowledge, as a banker, that the transaction was highly unusual in that the amount being offered as an interest rate was significantly more than any other bank was offering, coupled with the fact that the money was being wired out of the country, to a Eastern European country, Armenia, only to be later rewired back to New Jersey.

100.    At no time did anyone from Wells Fargo indicate any concern for the validity of the transaction.

101.    At no time did anyone from Wells Fargo indicate any concern that the money was being wired out of the country, to an Eastern European country, Armenia.

102.    Peters advised the Duncans that, in all the time she had worked for Wells Fargo, she had never wired this large an amount of money out of the country.

103.    Thereafter, Peters contacted a representative from the Large Wire Department at Wells Fargo.

104.    Mr. Duncan spoke with a male representative in the Wells Fargo's Large Wire Department, verifying the details of the transaction, Mr. Duncan's own identity and other personal information to ensure that the Duncans were not engaging in any type of money laundering scheme.

105.    The representative from the Wells Fargo Large Wire Department asked the Duncans many questions concerning themselves and the transaction, such as his mother's maiden name, where he lives, and other identifying information

106.    The Duncans confirmed their identify and went over the proposed transaction with the representative from the Large Wire Department at Wells Fargo.

107.    The Duncans discussed with the representative from the Large Wire Department at Wells Fargo that it was their intention to purchase a 1-year CD from BNY Mellon with an APR of 2.73%

108.    At no time did any representative from the Large Wire Department at Wells Fargo suggest that he had any concern whatsoever concerning the transaction and the wiring of the funds to Armenia, as previously set forth.

109.    The representative never indicated that a 2.73% APR on a Certificate of Deposit which allowed the Duncans a right to break the Certificate of Deposit was suspicious or even commented about the exorbitant APR.[2]

110.    The representatives from Wells Fargo were in a superior position to that of the Duncans, who were not experienced with handling investment transactions. The employees of Wells Fargo, on the other hand, dealt with financial transactions on a daily basis and banking was their sole purpose.

111.    These banking employees dealt with money as part and parcel of their entire professional lives at their banking institution.

112.    The banking representatives at Wells Fargo should have known that the 2.73%

---

[2] The Duncans had a right to break the Certificate of Deposit which was contained in the fraudulent material provided by the man who identified himself as "Barry Drucker." Usually, when a depositor is given a right to break the Certificate of Deposit, banks will offer the depositor a much lower interest rate. Here the high interest rate provided is in conflict with the Duncans' right to break the CD, which should have alerted the Wells Fargo's employees.

interest rate that was being offered to the Duncans was not a credible interest rate.

113.    At no time did the representative from the Large Wire Department at Wells Fargo suggest he should contact BNY Mellon for any reason, including to confirm the legitimacy of the transaction and the wire transfer.

114.    At no time did the representative from the Large Wire Department at Wells Fargo contact BNY Mellon to verify the transaction.

115.    At no time did anyone at Wells Fargo tell the Duncans that their transaction was very unusual, very suspicious, suspect or anything else that would cause any concerns with the Duncans, including that the Duncans should undertake any additional steps to confirm the legitimacy of that transaction.

116.    All questions were answered to the satisfaction of the Large Wire Department, which cleared the transaction.

117.    At no time did Peters actually state a reason for any inquiry.

118.    Wells Fargo had interbank contact information or other independent contact information enabling Wells Fargo to contact BNY Mellon and/or its subsidiary Pershing/Pershing Clearing LLC to verify the details of the proposed transaction, including ownership or control of the designated transferee account at Ameriabank CJSC ("Ameriabank"), an Armenian bank.

119.    At no point, did any representative from Wells Fargo attempt to contact the legitimate BNY Mellon (including Pershing) in New York or New Jersey, using their interbank contact information or other independent contact information, to verify the legitimacy of the wire transfer.

120.    Upon information and belief, at no time did anyone from Wells Fargo independently contact anyone at BNY Mellon to verify whether it was actually offering 1-year

CD's with an approximate APR of 2.73% at a point in time that competitive rates for similar instruments were closer to 1.5%.

121.    Upon information and belief, at no time did anyone from Wells Fargo contact anyone at BNY Mellon, using interbank contact information or other independent contact information, to verify the proposed wire transfer from Wells Fargo to an account with the beneficiary name "Pershing Clearing LLC, 1 Pershing Plaza, BNY Mellon Building, Jersey City, NJ 07399" at Ameriabank.

122.    Importantly, Wells Fargo received clear, written instructions from the Duncans that the funds to be transferred by wire transfer were to be deposited into an account held in their names with their beneficiary bank's name and address:

> Beneficiary Name:    Pershing Clearing LLC
>
> 1 Pershing Plaza, BNY Mellon Building
> Jersey City, NJ 07399

123.    Wells Fargo failed to comply with the Duncans' specific instructions that the funds must be wired to the above-mentioned account name.

124.    It was critically important to the Duncans that Wells Fargo wire the funds the above-mentioned account name as the Duncans stated they wanted to funds to be under the control of an account in the name of Pershing at all times.

125.    Peters advised the Duncans that Wells Fargo would wire the funds into an account in above-mentioned account name.

126.    Even more important, the wire transfer instructions initiated on the Duncans' behalf by Peters further stated in large black, bolded letters: "**General information: You can NOT have a bank as the final beneficiary**, unless the wire is a payment to Wells Fargo (i.e.: mortgage, auto loan, etc.,). We are required to know who the money is going to in order to ensure the funds are

not being used to support terrorist or drug activity. We need a beneficiary account, beneficiary bank, identification number and a complete physical address." Wells Fargo Wire Transfer Request (Exhibit K).

127.    The Duncans were never informed that the funds would not be deposited into an account held in their names, as they had directed.

128.    If the Duncans were informed that the funds would not be deposited into an account held in their names, as they had directed, they never would have went through with the transaction.

129.    Wiring funds from a financial institution located in the United States, to a financial institution located in a foreign county in Eastern Europe, only to then be re-wired to a financial institution in the United States, is a highly unusual transaction and should have set off alarm bells at Wells Fargo and certainly in Wells Fargo's Large Wire Department.

130.    The transaction's multiple routing destinations should have caused personnel at Wells Fargo to make an independent inquiry of BNY Mellon and/or Pershing Clearing LLC to confirm the legitimacy of the wire instructions.

131.    If Wells Fargo personnel would have made an independent inquiry of BNY Mellon and/or Pershing Clearing LLC to confirm the legitimacy of the wire instructions, they would have learned that the instructions were provided by a fraudulent party, the wire never would have been made, and the Duncans would not have lost $650,000.

132.    The Duncans initiated the wire transfer because they were not advised or warned by anyone at Wells Fargo of any highly unusual, irregular, questionable and/or suspicious aspects of the proposed wire transfer.

133.    The Duncans trusted Wells Fargo to advise them if they thought any part of the transaction was unusual, irregular, questionable and/or suspicious.

134.     Shortly after leaving the bank, while the Duncans were driving back home in their truck, Mrs. Duncan proceeded to call the real BNY Mellon's main number in an attempt to confirm the legitimacy of the transaction.

135.     Mrs. Duncan had the real BNY Mellon's office on speaker phone and explained to the representative who answered the phone that they had been working with "Barry Drucker" concerning the purchase of a jumbo CD.

136.     The receptionist indicated that the Duncans needed to contact their assigned agent directly.

137.     The Duncans decided they wanted to consider the offer of BNY Mellon further and cancelled the transfer within 30 minutes.

138.     The fraud would have been uncovered if the receptionist answering the phones at BNY Mellon had apprised the Duncans of the existence of this common scam.

139.     Later that same day, once home, the Duncans spoke again with the man identifying himself as "Barry Drucker" at the direct number he had given to them.

140.     The man identifying himself as "Barry Drucker" advised the Duncans that he worked for Pershing LLC and did not work for BNY Mellon.

141.     The fraudster proceeded to explain his entire resume to the Duncans.

142.     The fraudster further explained that it is very plausible that there was another man with his name, "Barry Drucker", who works for BNY Mellon.

143.     The man identifying himself as "Barry Drucker" also explained to the Duncans that the SWIFT code that he had provided to them earlier was indeed the correct SWIFT code.

144.     The Duncans then proceeded to call up the legitimate phone number of Pershing LLC and explained that they wanted to speak to the "Barry Drucker" of Pershing LLC.

145.    The representative from Pershing LLC indicated that the Duncans would have to contact their assigned agent directly.

146.    At no point did Pershing LLC indicate to the Duncans that there was not anyone by the name "Barry Drucker" at Pershing LLC.

147.    All of the above sounded plausible to the Duncans, especially as no one from Wells Fargo, including anyone from Wells Fargo's Large Wire Department, had said anything to give the Duncans any cause for concern.

148.    The following day, April 13, 2018, the Duncans returned to the Foley, Alabama, Wells Fargo branch and met again with Jennifer Peters.

149.    The Duncans had expressed that they just wanted their proceeds to be transferred to an account held in their names to Pershing Clearing LLC, 1 Pershing Plaza, BNY.

150.    Peters investigated the matter further by searching for "Barry Drucker" on the social media platform LinkedIn and viewing the profile of a "Barry Drucker" at BNY Mellon.

151.    Based on her LinkedIn search, Peters again noted that the transaction appeared legitimate.

152.    The Duncans relied on the further opinion of Jennifer Peters, a senior official at this branch of Wells Fargo, that the transaction was legitimate.

153.    The Duncans then spoke with a compliance officer while at Wells Fargo who advised them that they would have to speak to their agent directly if they had any questions.

154.    At no time did anyone from Wells Fargo independently contact or offer to independently contact BNY Mellon, Pershing or Pershing Clearing LLC to verify the accuracy, authenticity or legitimacy of the wiring instructions and related information.

155.    Instead, Wells Fargo relied on the conversations that its employees had with the

man who identified himself as "Barry Drucker," which took place through Mr. Duncan's personal cell phone.

156.    The only time Wells Fargo attempted to verify the identity or authority of the man who identified himself on the phone as "Barry Drucker" was by searching the name "Barry Drucker" and pulling up an employee of BNY Mellon named Barry Drucker on LinkedIn, which could have been created by any user.

157.    Wells Fargo provided no other independent type of investigation to confirm the identity of the man who identified himself on the phone as "Barry Drucker".

158.    Peters then wired the $650,000 as per the written instructions, to the Pershing Clearing account, Pershing Clearing LLC, 1 Pershing Plaza, BNY Mellon Building, Jersey City, NJ 07399, using the fraudulent beneficiary account number 1570029964920101.

159.    As the Duncans departed the Wells Fargo branch, Peters took Mrs. Duncan's hand and assured the Duncans that everything was okay, stating: "I feel very good about this. Everything is fine."

160.    At no time did anyone at Wells Fargo inform the Duncans that the funds they wired were not going into an account held in their names at the clearing account of Pershing Clearing LLC, 1 Pershing Plaza, BNY Mellon Building, Jersey City, NJ 07399, as Wells Fargo had been instructed in writing by the Duncans.

161.    The Duncans gave Wells Fargo specific verbal and written instructions that the funds being wired where to go into an account held in their names at the clearing account of Pershing Clearing LLC, 1 Pershing Plaza, BNY Mellon Building, Jersey City, NJ 07399.  (Exhibit I).

162.    Wells Fargo knew that it was important that the funds go into that specific account,

as Wells Fargo knew that from that account the funds were being re-wired to that account in the State of New Jersey.

163.    Wells Fargo agreed that the funds would go into that specifically named account.

164.    On April 16, 2018, the Duncans followed up with the man who identified himself as "Barry Drucker," who provided a statement indicating the funds had been deposited and told the Duncans that the CD certificate and related documentation would arrive in about a week.

165.    On April 23, 2018, the Duncans, having received nothing regarding the investment, attempted to contact "Barry Drucker," only to find that the contact numbers they had been given by him were no longer in service.

166.    Upon information and belief, the funds wired from Wells Fargo at the written direction of the Duncans never reached the clearing account, Pershing Clearing LLC, 1 Pershing Plaza, BNY Mellon Building, Jersey City, NJ 07399.

167.    Upon information and belief, the funds never reached any bank account owned or controlled by Pershing Clearing LLC, Pershing LLC or BNY Mellon.

168.    Upon information and belief, the funds never reached the clearing account, Pershing Clearing LLC, 1 Pershing Plaza, BNY Mellon Building, Jersey City, NJ 07399, as directed in writing by the Duncans, but were in fact stolen by individuals overseas, who were the true owners of the recipient account at Ameriabank, where the funds were wired.

169.    On April 23, 2018, suspecting they had been defrauded, the Duncans immediately contacted Wells Fargo.

170.    Wells Fargo represented that it would promptly take the necessary steps to recall the wire and would keep the Duncans informed.

171.    Upon information and belief, based on subsequent correspondence from Wells

Fargo and Ameriabank, some or all of the subject funds were still on deposit with Ameriabank when Ameriabank was advised of the fraud.  May 15, 2018 Email Chain (Exhibit L).

172.    Upon information and belief, the funds retained by Ameriabank could have been recovered without further loss had Wells Fargo submitted a timely cancellation request and other documents requested by Ameriabank for that purpose with all deliberate speed.

173.    Upon information and belief, Wells Fargo did not timely submit the documentation Ameriabank requested with all deliberate speed to facilitate the return of funds retained by Ameriabank to Wells Fargo and the Duncans.

174.    Despite numerous requests, Wells Fargo never provided any documentation to the Duncans or their counsel pertaining to the steps taken in response to any communications from Ameriabank regarding the recovery of these stolen funds.

175.    Ameriabank indicated that it would seek to recover such funds if such action was requested by Wells Fargo via industry standard procedures and channels.

176.    The Duncans instructed Wells Fargo to communicate directly with Ameriabank to effectuate recovery/recall of the funds.

177.    Wells Fargo thereafter stopped responding to the Duncans' requests for status updates and documentation.

178.    On May 16, 2018, Plaintiffs' counsel reiterated the details of the fraud in a letter to Wells Fargo (Exhibit M) and, on May 24, 2018, a letter was sent to BNY Mellon concerning its role in facilitating this fraud (Exhibit N).

179.    BNY Mellon responded in a letter dated June 11, 2018 (Exhibit O), denying any responsibility for the fraud.

180.    Wells Fargo, in its letter of August 14, 2018 (Exhibit P), denied responsibility,

setting forth broad, boilerplate exculpatory language from its Wire Transfer Request Form and citing undocumented recollections from employees at the Foley, Alabama, Wells Fargo branch, purportedly contradicting those of the Duncans.

181.    Wells Fargo never responded to counsel's letter setting forth the specific facts of the incident and requesting Wells Fargo take specific, immediate action.

182.    Upon the Duncans' request of Wells Fargo for documents relied upon in its alleged internal investigation, Wells Fargo, on September 17, 2018, provided a few previously withheld materials, including relevant SWIFT messages (Exhibit Q), but declined to provide relevant policies or procedures or the relied-upon notes, accounts or memoranda from its interviews with its involved employees.

183.    In light of the SWIFT messages provided to the Duncans and their correspondence with Defendants, Wells Fargo apparently requested cancellation of the transfer as requested by the Duncans, but in a belated and untimely fashion.

184.    Due to the belated and untimely action by Wells Fargo, the Duncans lost some or all of their funds.

185.    Unlike the involved foreign banks, Wells Fargo made no effort and/or did not make a timely effort to contact law enforcement, apprise the Duncans of what occurred or otherwise assist the Duncans in tracking or recouping any of the stolen funds, some of which were apparently available to be recouped if Wells Fargo had timely implemented proper procedures.

186.    To date, none of the Duncans' funds have been returned to the Duncans.

## COUNT I
## NEGLIGENCE
### (Against Wells Fargo Bank, N.A.)
#### *Failure to advise the Duncans regarding the highly suspect wire transfer*

187.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

188.    To sustain a negligence claim, a plaintiff must show that the defendant owed the plaintiff a cognizable duty of care, that the defendant breached that duty, and that the plaintiff suffered damages as a proximate result of that breach.

189.    A bank has a duty to exercise reasonable skill and care in carrying out activities for its customers.

190.    Courts have held that banks owe a duty of reasonable care to their customers.

191.    Courts have held that banks owe a duty of reasonable inquiry to their customers.

192.    A duty of disclosure may arise where: (1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge.

193.    Wells Fargo was under a duty to use reasonable care in advising the Duncans regarding the highly suspect wire transfer.

194.    At all times, Wells Fargo held itself out as a financial institution offering its customers a full panoply of secure banking services. *See, e.g.,* https://www.wellsfargo.com/online-banking/tour/ ("Your security is our priority…Wells Fargo has been dedicated to protecting your personal and financial information for more than 160 years…. Bank with confidence"). https://www.wellsfargo.com/online-banking/tour/ (Exhibit R).

195.    Wells Fargo also stated on its website, "When you practice due diligence with regards to security, wire transfers can be an easy, convenient way to transmit money."

https://www.wellsfargo.com/financial-education/basic-finances/manage-money/payments/ins-outs-transfers/ (Exhibit S).

196.    Wells Fargo has maintained that it protects its customers' accounts from fraud and provides online security guarantees by providing certain protection to its customers. It also indicates that they have 24/7 fraud monitoring. https://www.wellsfargo.com/privacy-security/fraud/protecting-you/ (Exhibit T).

197.    The Duncans relied upon Wells Fargo's expertise and/or advice in the transfer of funds, including the wire transfer of funds.

198.    The Duncans relied upon Wells Fargo's expertise and/or advice to alert them that a contemplated transaction such as a fund transfer was highly unusual, irregular, questionable and/or suspicious

199.    Wells Fargo knew or should have known that the wire transfer of funds made such funds particularly vulnerable to scams and cyber threats, as "[a] wire transfer is an immediate form of payment." Wells Fargo, "Scams and Cyber Threats," https://www.wellsfargo.com/privacy-security/fraud/bank-scams/ at 1. (Exhibit U).

200.    Wells Fargo knew or should have known that those committing such frauds had specifically targeted retired people with numerous schemes designed to defraud them out of their money.

201.    Wells Fargo knew or should have known that, as part of these fraudulent schemes, those committing such frauds made specific use of the vehicle known as "Web-site spoofing" ("spoofing"), which consists of "creating fraudulent websites that look similar, if not identical, to an actual site, such as that of a bank." Alert 2000-9; See also https:www.occ.treas.gov/news-issuances/alerts/2000/alert-2000-9.htrml (Exhibit V); OCC Bulletin 2005-24. (Exhibit W);

*Internet Security*, BNYMELLON, https://www.bnymellon.com/ca/en/internet-security.jsp (Exhibit AA); *see also* https://www.bnymellon.com/us/en/terms-of-use.jsp (Exhibit BB) (same information on United States site, provided with website Terms of Use); FBI Public Service Announcement (PSA), *Business E-mail Compromise E-mail Account Compromise The 5 Billion Dollar Scam* (May 4, 2017) (Exhibit A); FBI PSA, Business *E-mail Compromise The 12 Billion Dollar Scam* (July12, 2018) (Exhibit B).

202.    Wells Fargo was notified that such spoofing "exposes a bank to strategic, operational, and reputational risks; jeopardizes the privacy of bank customers; and exposes banks and their customers to the risk of financial fraud." OCC Bulletin 2005-24. (Exhibit W).

203.    Wells Fargo knew or should have known that banking institutions had been repeatedly warned and advised to "train customer-service personnel to identify and report customer calls that may stem from potential Web-site attacks," and collect available information about the attack to enable an appropriate response.

204.    Wells Fargo knew or should have known that banking institutions, upon suspecting a Web-site attack, were warned and advised to take affirmative actions including contacting the fraudulent website's domain name registrars and the Internet service provider hosting the site to demand that the website be taken down, as well as contacting law enforcement authorities, specifically, the OCC, the FBI, and also appropriate state and local authorities. *Id.* at 3-4.

205.    Wells Fargo knew that BNY Mellon is an American worldwide banking and financial services holding company headquartered in New York City.

206.    Wells Fargo, acting as the fiduciary, direct agent and facilitator of its depositors, the Duncans, knew that the usual and customary way for such depositors to wire transfer funds to an account located in the United States, such as with BNY Mellon, would be to wire the funds

directly to the designated account at the institution itself, in the United States.

207.    Wells Fargo, acting as the fiduciary, direct agent and facilitator of its depositors, the Duncans, knew or should have known that the wire transfer to an account purportedly located in the United States at BNY Mellon, by way of a bank in Armenia, was highly suspect.

208.    Wells Fargo, acting as the fiduciary, direct agent and facilitator of its depositors, the Duncans, had a duty to confirm the validity of such an unusual and suspect transaction.

209.    Wells Fargo also had a duty to exercise reasonable skill and care in carrying out its activities for its customers.

210.    Wells Fargo owed its customers, and especially the Duncans, a duty to take reasonable steps to prevent such customers from wiring their funds to criminals, when due to the circumstances of the proposed transaction, Wells Fargo was on notice that the transaction was highly unusual, irregular, questionable and/or suspicious.

211.    A refusal to correct an error in relaying information constitutes a breach of that duty.

212.    Wells Fargo breached that duty to the Duncans insofar as Wells Fargo employees, in personally speaking directly to this criminal, took no action whatsoever to verify the true identity of the person to whom they were speaking, the authenticity of the website or offer, giving rise to the wire transfer, or the knowledge or authority of the supposed offeror and intended recipient, BNY Mellon.

213.    To show proximate cause, a Plaintiff must establish that the defendant's negligence was a substantial and foreseeable factor in bringing about his or her injury.

214.    With regard to foreseeability, the test is whether under all the circumstances the chain of events that followed the negligent act or omission was a normal or foreseeable

consequence of the situation created by the defendant's negligence.

215.    The Duncans have established that Wells Fargo's negligence was a substantial and foreseeable factor in misappropriating its funds.

216.    It was foreseeable that the funds were going to be misappropriated as Wells Fargo was presented with numerous red flags, all of which it ignored.

217.    As a direct and proximate result of Wells Fargo's negligence, Plaintiffs have suffered damages and are entitled to relief.

**COUNT II**
**NEGLIGENCE**
**(Against Wells Fargo Bank, N.A.)**
*Failure to properly and adequately train personnel to prevent fraudulent transactions*

218.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

219.    The employees at Well Fargo are tested periodically, as part of a training protocol, on all types of fraud, including wire fraud and spoofed bank websites.

220.    Wells Fargo was well aware of the potential for fraud upon its depositors, such as the Duncans, through the use of website spoofing, and Wells Fargo knew or should have known that it could mitigate that risk by actively training its employees in fraud prevention techniques, seeking out law enforcement assistance on national, state and local levels to avoid having its depositors fall victims to such spoofing, and using an active customer education program to prevent customers being victimized in such a manner. OCC Bulletin No. 2005-24 at 1-2. (Exhibit W).

221.    Upon information and belief, the fraud prevention training program referred to above was a continuing program that was given to Wells Fargo personnel on an ongoing basis.

222.    Upon information and belief, the fraud prevention training program referred to

above was a continuing program that was given on an ongoing basis to Wells Fargo personnel and included how to spot fraudulent or spoofed websites.

223.    Upon information and belief, the fraud prevention training program referred to above was a continuing program that was given on an ongoing basis to Wells Fargo personnel and included how to spot fraudulent or spoofed websites and what to do if confronted with a suspicious website.

224.    Upon information and belief, the fraud prevention training program referred to above was a continuing program that was given on an ongoing basis to Wells Fargo personnel and included what to do if they were confronted with highly unusual, irregular, questionable or suspicious situations.

225.    Upon information and belief, the personnel at Wells Fargo did not follow the training or instructions received at Wells Fargo when confronted with potential website spoofing, highly unusual, irregular, questionable or suspicious situations.

226.    Wells Fargo employees had a duty to exercise due diligence. The employees of Wells Fargo assumed a duty when they undertook to purportedly verify the identify of "Drucker" on LinkedIn, which is not an adequate means of ensuring a recipient of over a half a million dollars is who he says he is.

227.    Wells Fargo, through its employees, also breached its duty to the Duncans in giving them verbal assurances that the wire transfer they contemplated and ultimately consummated was ordinary, valid or otherwise appropriate to their purpose, thereby dissuading the Duncans from taking any additional action.

228.    As a direct and proximate result of Wells Fargo's negligence, Plaintiffs have suffered damages and are entitled to relief.

### COUNT III
### NEGLIGENCE
### (Against Wells Fargo Bank, N.A.)
### *Failure in its handling of the wire transfer*

229.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if set forth herein and further allege as follows:

230.   The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension.

231.   Wells Fargo should have been able to reasonably perceive that the risk that is inherent in wire transfers, mainly that its customers are potential victims to fraudulent transactions.

232.   Wells Fargo owed a duty to execute wire transfer pursuant to the wiring instructions it received from the Duncans.

233.   Wells Fargo also had assumed a duty to the Duncans after Plaintiff's counsel requested Wells Fargo's aid and assistance in recovering the stolen funds. May 24, 2018, a letter was sent to BNY Mellon concerning its role in facilitating this fraud (Exhibit N).

234.   "Wells Fargo informed the Duncan's that the wire would go first to a Pershing Clearing LLC account in a bank outside the U.S. and then back into Pershing Clearing LLC in the United States, specifically Jersey City, NJ.  At no time were the Duncan's informed by anyone at Wells Fargo, including Ms. Peters or the Wells Fargo Bank Large Wire Department, that the funds would not be going into a Pershing LLC account as they had specifically instructed." Letter to Wells Fargo dated May 16, 2018 (Exhibit M).

235.   There was an agreement that the funds would go into an account with THAT name.

236.   When Wells Fargo denied the claim, it never denied that fact.

237.   Wells Fargo had a duty of care to the Duncans, and it acted unreasonably in the handling of the wire transfer.

238.    Wells Fargo had specific instructions which are contained in the Wells Fargo quick reference guide which instructs its employees to "be sure to complete Beneficiary Information including name, address and account number. (City and country are required for international wires). Wells Fargo, Wire Transfer Quick Reference Guide (Exhibit X).

239.    Wells Fargo indicated in large, black, bolded letters on the Wire Transfer Agreement: "**General Information: You can NOT have a bank as the final beneficiary.**" Wells Fargo Wire Transfer Request. (Exhibit K).

240.    Wells Fargo failed to execute the wire transfer pursuant to the written instructions it received from the Duncans.

241.    Nowhere in the international disclosure form does it state that Wells Fargo would not honor the client's demand that the funds go into a specifically named account. *Id.*

242.    In addition, Wells Fargo undertook to provide and purportedly did conduct a "Risk Evaluation" with respect to the Duncans' transfer.

243.    Upon information and belief, the fraudulent transaction passed Wells Fargo's "Risk Evaluation" without issue.

244.    By undertaking to provide a "Risk Evaluation" for the transaction, Wells Fargo had a duty to exercise due care in performing such evaluation and duty to take appropriate action with the results, including but not limited to apprising the customer of any risks discovered.

245.    Wells Fargo breached this duty by failing to notify the Duncans of any concerns raised by its Risk Evaluation and/or failing to conduct the Risk Evaluation with reasonable care and diligence, insofar as the transaction's numerous peculiarities and patent red flags were missed or ignored.

246.    Peters did not follow the instructions by listing a bank, "Pershing Clearing LLC"

under the Beneficiary/Recipient Name on the Wire Transfer Request.

247.    If the personnel at Wells Fargo had followed the training or instructions received at Wells Fargo when confronted with potential website spoofing, or highly unusual, irregular, questionable or suspicious situations, the Duncans would not have lost $650,000.

248.    Upon information and belief, as part of its desire to stay abreast of the latest methods of fraud, Wells Fargo joined or should have joined organizations with the intent to stay abreast of the newest methods being utilized by those committing such frauds and divesting banks of their depositors' funds.

249.    As part of its desire to stay abreast of the latest methods of fraud, Wells Fargo received or should have received information from the FBI and other United States Government agencies regarding the newest methods being utilized by those committing such frauds to defraud the bank's customers of their funds.

250.    Upon information and belief, as part of its desire to stay abreast of the latest methods of fraud, Wells Fargo, through its ongoing training and information gathering activities, learned or should have learned that those committing such frauds had been known to convince bank depositors to wire and transfer funds to the bank accounts of such criminals outside the United States.

251.    Despite the knowledge of the aforesaid fraudulent schemes involving the wire transfer of depositors' monies, both in and outside the United States, through the use of spoofed websites and the information contained on such websites; despite the knowledge that the aforesaid fraudulent schemes could be detected and avoided by responsibly checking the veracity of websites utilized by such criminals; despite the knowledge that the aforesaid fraudulent schemes could be detected and avoided by checking the identity of those individuals who perpetrated these schemes,

especially when Wells Fargo employees came into direct contact with them, Wells Fargo did nothing to prevent its depositors, the Duncans, from being defrauded and relieved of their funds, but instead facilitated the fraudulent activity of the criminals who perpetrated such deeds.

252.    Wells Fargo owed its customers, the Duncans, a duty to advise, protect and prevent them from wiring funds to these criminals.

253.    Wells Fargo owed its customers, the Duncans, a duty to advise, protect and prevent a wire transfer that it knew, or should have known, was suspect, unusual, and fraudulent in nature.

254.    Wells Fargo took no such actions.

255.    Wells Fargo facilitated such fraudulent activities by assuring its depositors, the Duncans, of the commonality, appropriateness, innocence or fundamentally sound nature of a transaction which Wells Fargo knew or should have know was none of those things.

256.    Wells Fargo owed its customers, the Duncans, a duty, in the event a wire transfer that the customer was requesting was suspect, to make known that the transfer was suspect and advise the customer of what steps to take to confirm the legitimacy of the wire transfer.

257.    Wells Fargo took no such actions.

258.    It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.

259.    Even if Wells Fargo had not owed the Duncans a duty solely by virtue of its role in the transaction, Wells Fargo *assumed* a duty to act carefully and reasonably by virtue of its (Ms. Patterson's) direct contact with the man who identified himself as "Barry Drucker."

260.    Wells Fargo, through its employee Patterson, breached this duty by dealing directly with "Drucker" while making no attempt to verify his identity of the legitimacy of the transaction.

261.    Wells Fargo also became subject to a duty of acting carefully, based on Peters'

search for the website on her Wells Fargo computer and her personal phone.

262.    Wells Fargo, through its employee Peters, breached this duty insofar as she undertook an independent investigation of the matter, representing the same to the Duncans, but failed to exercise reasonable diligence in her investigation.

263.    As a direct and proximate result of Wells Fargo's negligence, Plaintiffs have suffered damages and are entitled to relief.

### COUNT IV
### NEGLIGENCE
### (Against Wells Fargo Bank, N.A.)
#### *Failure to confirm legitimacy of transaction with BNY Mellon and Ameriabank*

264.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

265.    A bank may be liable for participation in a diversion of funds, either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed.

266.    Adequate notice may come from circumstances which reasonably support the sole inference that a misappropriation is intended, as well as directly.

267.    Having such a knowledge, the bank is under the duty to make reasonable inquiry and endeavor to prevent a diversion.

268.    Facts sufficient to cause a reasonably prudent person to suspect that funds are being misappropriated trigger a duty of inquiry on the part of a depository bank, and the bank's failure to a conduct a reasonable inquiry when the obligation arises will result in the bank being charged with such knowledge as inquiry would have disclosed.

269.    Wells Fargo owed its customers, the Duncans, a duty, in the event a wire transfer that the customer was requesting was suspect, to do whatever was reasonably necessary to confirm

the validity of the suspect wire transfer before executing the wire transfer.

270.    Wells Fargo took no such actions.

271.    Wells Fargo also undertook to verify the legitimacy of the spoofed website and advised the Duncans that the website appeared to be legitimate, notwithstanding that the amount of the wire transfer totaling over $650,000 was so significant.  Wells Fargo failed to give the transaction the heightened scrutiny that was required under the circumstances.

272.    Wells Fargo never took such actions to protect its depositors.

273.    Furthermore, the nature of the wire transfer was highly suspect as the funds were to go from Alabama to Armenia, and then, purportedly, back to New Jersey.  Wells Fargo representatives should have been aware of the red flags regarding such an unusual inquiry and informed the Duncans.

274.     Having touted its expertise and security procedures and having undertaken to confirm the legitimacy of the investment offer based on its professional expertise and judgment, Wells Fargo had a duty to the Duncans to act with reasonable care in investigating and effectuating the wire transfer, and to take reasonable remedial measures when the fraud became known.

275.    The Duncans relied on Wells Fargo verifying the legitimacy of the transaction.

276.    Wells Fargo breached its duty to the Duncans by failing to appreciate or alert them to various indicia of fraud surrounding the transaction. At no point were the Duncans advised that transferring funds to an American financial institution via an Armenian bank account was unusual or suspect — as any bank or wire transfer provider should have known — and bore all of the hallmarks of cyber-initiated wire fraud.

277.    Wells Fargo also breached its duty to the Duncans by failing to exercise reasonable care and diligence in its investigation, insofar as Wells Fargo made no attempt to verify the

Armenian account indeed belonged to BNY Mellon/Pershing, nor did Wells Fargo contact BNY Mellon or take other basic steps to verify the accuracy, authenticity and legitimacy of the wiring instructions, despite all the warning signs present.

278.    Despite these deficiencies, Wells Fargo's investigation still revealed significant indicia of fraud — such as the spoofed website being blocked from access by Wells Fargo's own computers — and only accessible via the Duncans' personal cell phone, which gave rise to a further duty to warn or duty or further investigation on the part of Wells Fargo.

279.    As a direct and proximate result of Wells Fargo's negligence, Plaintiffs have suffered damages and are entitled to relief.

**COUNT V**
**NEGLIGENCE**
**(Against Wells Fargo Bank, N.A.)**
***Failure to take immediate action to reclaim proceeds from wire transfer***

280.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

281.    Wells Fargo breached its duty to the Duncans by failing to follow industry standard procedures and communicate promptly with Ameriabank to request cancellation and return of the funds, despite knowing, pursuant to the Duncans' instructions, that at least a portion of the subject funds could be recovered if timely action was taken.

282.    Wells Fargo failed to stop the transfer to Ameriabank when its employees realized or should have been put on notice about the fraudulent scheme that was being perpetrated.

283.    Wells Fargo also delayed in the process of recouping the funds back in a timely manner prior to the transfer of money out of Ameriabank.

284.    Wells Fargo also failed to timely follow the steps that Ameriabank outlined for it in the SWIFT messages to freeze the account.

285.     Furthermore, the incorrect assurances given the Duncans by employees of Wells Fargo lulled the Duncans into a false sense of security, thus preventing a quicker realization of the fraud and cancellation of the transfer of the funds, all to the Duncans' detriment.

286.     As a direct and proximate result of Wells Fargo's negligence, Plaintiffs have suffered damages and are entitled to relief.

**COUNT VI**
**VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT OF 1978**
**(Against Wells Fargo Bank, N.A.)**

287.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

288.     The Electronic Fund Transfer Act of 1978, 15 U.S.C. § 1693 *et seq*. ("EFTA") and its implementing regulations, Regulation E, Subpart B (the "Regulations") were enacted for the purpose of protecting the rights of consumers in the context of non-commercial electronic fund and remittance transfers.  15 U.S.C. §§ 1693(b), 1693a(2).

289.     The wire transfer at issue was a consumer "remittance transfer" governed by the EFTA and Regulation, and Wells Fargo, which provides remittance transfers in the normal course of its business, is a "remittance transfer provider." *See* 15 U.S.C. § 1693o-1(g); 12 C.F.R. § 1005.30.

290.     Under the EFTA and Regulations, a remittance transfer provider's failure to make funds available to a designated recipient by the promised date of availability constitutes an "error", except in certain circumstances enumerated in the EFTA and Regulations. *See* 12 C.F.R. § 1005.33(a)(1)(iv).

291.     That the remittance transfer sender provided an incorrect account number or recipient institution identifier for the designated recipient's account or institution does not excuse

38

the remittance transfer provider's failure to make the funds available to the designated recipient, unless the remittance transfer provider, among other requirements, used reasonably available means to verify the recipient information and promptly used reasonable efforts to recover the funds. 12 C.F.R. § 1005.33(a)(1)(iv)(D), § 1005.33(h).

292.    In the event of a possible error made known and reasonably identified to a remittance transfer provider within 180 days, the remittance transfer provider shall investigate promptly and determine whether an error occurred within 90 days of the error notice, and, within three days after completing its investigation, the remittance transfer provider shall report the results thereof to the remittance transfer sender. 12 C.F.R. § 1005.33(b)(1), (c)(1).

293.    If the remittance transfer provider determines that no error occurred, said provider shall furnish the remittance transfer sender with a report of the provider's investigation explaining the findings thereof and addressing the sender's complaints. 12 C.F.R. § 1005.33(d)(1).

294.    The investigation report provided to the sender shall also note the sender's right to request the documents on which the provider relied in making its error determination, and the provider shall promptly comply with any such request. 12 C.F.R. § 1005.33(d).

295.    Any person who fails to comply with any provision of the EFTA with respect to any consumer is liable to such consumer in an amount equal to the consumer's actual damages as the result of such failure, plus an additional $100 to $1,000, as well as costs and attorney's fees. 15 U.S.C.§ 1693m(a).

296.    Wells Fargo failed to make the funds in question available to the designated recipient, Pershing Clearing LLC, by the promised date of availability.

297.    Wells Fargo failed to use reasonably available means to verify the recipient account belonged to the intended recipient and failed to use reasonable efforts to recover the funds.

298.    The Duncans notified Wells Fargo of this error on or before April 23, 2018, well within 180 days of the disclosed date of availability, and they provided sufficient information for Wells Fargo to identify the remittance transfer at issue and the parties thereto. 15 U.S.C. § 1693o-1(d); 12 C.F.R. § 1005.33(b).

299.    "A remittance transfer provider shall refund, at no additional cost to the sender, the total amount of funds provided by the sender in connection with a remittance transfer, including any fees and, to the extent not prohibited by law, taxes imposed in connection with the remittance transfer, within three business days of receiving a sender's request to cancel the remittance transfer." 12 C.F.R. § 1005.34.

300.    "A remittance transfer provider is liable for any violation … by an agent when such agent acts for the provider." 12 C.F.R. § 1005.35.

301.    Wells Fargo violated the EFTA and Regulation E, Subpart B by rendering an error determination inconsistent with available evidence and EFTA standards, insofar as Wells Fargo declared that no error occurred without any mention or evidence of Wells Fargo either employing reasonable means to verify that the Ameriabank account belonged to the transfer's intended recipient, or making reasonable efforts to recover the funds when notified of the fraud.

302.    Wells Fargo also violated the EFTA and Regulation E, Subpart B, in that it failed to render an error determination within 90 days, providing no response or updates until August 14, 2018, and that response did not notify the Duncans of their right to request the documents on which Wells Fargo relied in making its error determination.

303.    Wells Fargo further violated the EFTA and Regulation E, Subpart B, by withholding, despite the Duncans' timely request therefor, various documents relied upon in making its error determination, including but not limited to documents associated with its

purported "Risk Evaluation."

304.    As a direct and proximate result of Wells Fargo's noncompliance with the EFTA,
Plaintiffs have suffered damages and are entitled to relief.

305.    Wells Fargo is liable to Plaintiffs in the amount of their actual damages, $650,000,
plus statutory damages of $100 to $1000, and such further relief as this Court deems just and
appropriate.

## COUNT VII
## VIOLATION OF UCC ARTICLE 4 AND STATE ANALOGUES
### (Against Wells Fargo)

306.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if
fully set forth herein and further allege as follows:

307.    "Payor bank" means a bank that is the drawee of a draft. UCC §4-105(3).

308.    "Drawee" means a person ordered in a draft to make payment. UCC §4-104(8).

309.    "Draft" means a draft as defined in Section 3-104 or an item, other than an
instrument, that is an order. UCC §4-104(7).

310.    "Certificate of deposit" means an instrument containing an acknowledgment by a
bank that a sum of money has been received by the bank and a promise by the bank to repay the
sum of money. A certificate of deposit is a note of the bank. UCC §3-104(i).

311.    Wells Fargo is the payor bank as Wells Fargo is the bank that was ordered by the
Duncans to transfer their funds into a certificate of deposit to BNY Mellon.

312.    A payor bank is liable to its customer for damages proximately caused by the
wrongful dishonor of an item. Liability is limited to actual damages proved and may include
damages for … other consequential damages. Whether any consequential damages are proximately
caused by the wrongful dishonor is a question of fact to be determined in each case. UCC §4-402.

313.    A bank's conscious and deliberate decision to remain ignorant of the existence of a

fraudulent scheme despite irregularities on the face of a transaction constitutes bad faith. Bad faith may properly be found where there has been either a gross violation of bank policies over an extended period and/or involving large sums, or a conscious and deliberate decision to ignore the existence of a fraudulent scheme.

314.    Where negligent handling of an item is concerned, recoverable damages are generally limited to the difference between the total amount of the item and the amount of the loss that could not be avoided by use of ordinary care. The same rule applies to damages caused by bad faith conduct.

315.    Under New York law, a claim of commercial bad faith requires that the bank have actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in a fraudulent scheme; a transferee's lapse of wary vigilance, disregard of suspicious circumstances which might have well induced a prudent banker to investigate, and other permutations of negligence, are not relevant considerations.

316.    Wells Fargo acted in bad faith when it remained ignorant of the multiple red flags it encountered resulting from fraudulent scheme devised by the man who identified himself as "Barry Drucker."

317.    Wells Fargo continued to act in bad faith when it denied responsibility in its letter dated August 14, 2018 (Exhibit P).

318.    Wells Fargo is liable to Plaintiffs, and Plaintiffs are entitled to relief in an amount to be determined by the court.

**COUNT VIII**
**VIOLATION OF UCC ARTICLE 4A AND STATE ANALOGUES**
**(Against Wells Fargo)**

319.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

320.    Parties whose conflict arises out of a funds transfer should look first and foremost to Article 4-A for guidance in bringing and resolving their claims.

321.    Article 4A of the Uniform Commercial Code ("UCC") governs fund transfers, including wholesale wire transfers.

322.    Article 4A defines the basic elements of a funds transfer, as a series of offsetting transaction which begin with an originator's payment order and concludes with payment to the beneficiary of that order.

323.    The state analogues are contained in such: ALA. CODE § 7-4A-101 *et seq.* (1975); CAL. COM. CODE § 11101 *et seq.* (1990); DEL. CODE ANN. TIT. 6. § 4A-1-101 *et seq.* (1992); N.J. STAT. ANN. §12A:4A-101 *et seq.* (1994); N.Y.U.C.C. § 4-A-101 *et seq.* (2014); and S.D. CODIFIED LAWS § 57A-4A-101 *et seq.* (1991).

324.    The UCC was enacted to respond to the growing use of funds transactions and the absence of comprehensive body of law -statutory or judicial- that defined the jurisdictional nature of funds transfer or the rights and obligations flowing from payment orders. UCC § 4A-102.

325.    Article 4A was carefully crafted to balance the interest of commercial and financial organizations with the public interest. The rules that emerged from the UCC represent a careful and delicate balancing of those interests.

326.    Article 4A is not the exclusive means by which a plaintiff can seek to redress an alleged harm arising from a funds transfer.

327.    Furthermore, Article 4A does not expressly or impliedly preclude common law

claims. Nothing in Article 4A suggests that the drafters intended it to insulate a wrongdoer from liability in connection with funds transfers that were effectuated as intended.

328.    "Beneficiary" means the person to be paid by the beneficiary's bank. UCC § 4A-103(2).

329.    Hal Duncan and Marsha Duncan are classified as beneficiaries, as they are the persons that were intended to be paid by BNY Mellon.

330.    "Beneficiary's bank" means the bank identified in a payment order in which an account of the beneficiary is to be credited pursuant to the order or which otherwise is to make payment to the beneficiary if the order does not provide for payment to an account. UCC § 4A-103(3).

331.    BNY Mellon is classified as the beneficiary bank, as this is the account where the Duncans intended their account to be credited.

332.    "Receiving bank" means the bank to which the sender's instruction is addressed. UCC § 4A-103(4).

333.    Ameriabank is classified as the receiving bank as this is where Wells Fargo's outgoing transfer request was addressed even though it was intended to be an intermediary bank.

334.    "Sender" means the person giving the instruction to the receiving bank. UCC § 4A-103(5).

335.    Wells Fargo is classified as a sender as Wells Fargo is the entity responsible for giving the Duncans' instruction to the receiving bank, known as Ameriabank.

336.    "Funds transfer" means the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to

carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order. UCC § 4-104 (a).

337.    "Intermediary bank" means a receiving bank other than the originator's bank or the beneficiary's bank. UCC § 4-104 (b).

338.    Ameriabank is a receiving bank other than the originating bank and or the beneficiary bank.

339.    "Originator" means the sender of the first payment order in a funds transfer. UCC § 4-104 (c).

340.    Hal Duncan and Marsha Duncan are the originators of the first payment order in the funds transfer.

341.    "Originator's bank" means (i) the receiving bank to which the payment order of the originator is issued if the originator is not bank. UCC § 4-104 (d).

342.    Wells Fargo is the originator's bank as Wells Fargo is the receiving bank to which the payment is issued.

343.    Good faith has been defined by the UCC as "honesty in fact and the observance of reasonable commercial standards." UCC § 4-105(6).

344.    "Security procedure" means a procedure established by agreement of a customer and a receiving bank for the purpose of (i) verifying that a payment order or communication amending or cancelling a payment order is that of the customer, or (ii) detecting error in the transmission or the content of the payment order or communication. N.Y.U.C.C. § 4-A-201.

345.    According the UCC, a security procedure is an agreed upon procedure that the parties have signed.

346.     The signature on the Wire Transfer Request Form is redacted. Wells Fargo Wire Transfer Request (Exhibit K).

347.     UCC Article 4A imposes three requirements (1) the bank and the customer must have agreed on a security procedure for verifying payment orders; (2) the agreed-upon security procedure must be a commercially reasonable method of providing security against unauthorized payment orders; and (3) the bank must have accepted the payment order in good faith and in compliance with the security procedure and any relevant written agreement or customer instruction.

348.     Wells Fargo security procedure must satisfy the definition of a security agreement and the commercial reasonableness is a question of law of law for the court. Furthermore, the Duncans never signed an agreement with Wells Fargo.

349.     "A security procedure is deemed to be commercially reasonable if (a) the security procedure was chosen by the customer after the bank offered, and the customer refused, a security procedure that was commercially reasonable for that customer, and (b) the customer expressly agreed in writing to be bound by any payment order, whether or not authorized, issued in its name and accepted by the bank in compliance with the security procedure chosen by the customer." N.Y.U.C.C. § 4-A-202(3).

350.     Ineffective transfers are those in which the bank has not properly executed security procedures.

351.     Wells Fargo did not have a commercially reasonable security procedure in place.

352.     The Duncans did not agree to the security procedures implemented by Wells Fargo.

353.     In the banking industry there is a well-known phrase, "Know Your Client."

354.     In the banking industry there is another well-known phrase, "Know Your

Customer." Wells Fargo has entrusted its employees with the responsibilities to "Analyze high-risk customer transaction activity to ascertain legitimacy of the transaction, ensuring that the activity is commensurate with the customer's profile." https://www.linkedin.com/jobs/view/know-your-customer-kyc-consultant-operational-risk-consultant-3-at-wells-fargo-1123156214 (Exhibit Y).

355.    The Defendant, Wells Fargo, owed the Plaintiffs a duty to employ commercially reasonable security procedures for the wire transfer in question.

356.    The Defendant, Wells Fargo, did not employ any security procedures for the wire transfer in question.

357.    The Defendant, Wells Fargo, did not employ proper security procedures for the wire transfer in question.

358.    The Defendant, Wells Fargo did not employ sufficient security procedures for the wire transfer in question.

359.    Wells Fargo did not offer the Plaintiffs to employ any specific security procedures for the wire transfer in question.

360.    Wells Fargo did not offer the Plaintiffs to employ any alternative security procedures for the wire transfer in question.

361.    In employing security procedures for the wire transfer in question, Wells Fargo should have taken into consideration a number of factors including the size, type and frequency of wire transfers normally issued by the Duncans, any alternative security procedures offered to the Duncans and security procedures generally used by banks in similar situations.

362.    Additionally, in employing and/or determining what security procedures to employ for the wire transfer in question, Wells Fargo should have taken into consideration that the Duncans

are not regular senders of wire transactions and have never sent an international wire transaction (and certainly not one to an Eastern European country); that the Duncans were relatively novices in wire transactions; that wire transactions to Eastern European countries are highly suspect in the banking industry; that the wire was of retirement funds of the Duncans; and that the wire transaction was of a very large amount of money.

363.    Additionally, in employing and/or determining what security procedures to employ for the wire transfer in question, Wells Fargo should have taken into consideration that the Duncans were induced to send these funds as a result of an offer of a 1-year certificate of deposit and a rate nearly twice the advertised rate being offered in the marketplace.

364.    Due to the nature of the wire transfer in question – that being a wire transfer of $650,000 which was known by Wells Fargo to be part of the retirement funds belonging to the Duncans, being wired to the Bank of New York Mellon via their clearing house Pershing Clearing LLC located in the State of New Jersey by way of a wire transfer to a bank located in an Eastern European country, Armenia, was such a highly extraordinary transaction — it required Wells Fargo to employ additional commercially reasonable security procedures, under the facts and circumstances of this particular transaction.

365.    Another unusual factor in this transaction was the size of the transaction. This was the largest international wire that that Patterson had ever encountered.

366.    Upon information and belief, Patterson had never previously performed an international wire to a bank in Armenia.

367.    Upon information and belief, Patterson had never previously performed an international wire to an Armenian bank as intermediary bank, for said intermediary bank to then re-wire those same funds to a bank in the United States, and accordingly, the facts of this particular

transaction was so highly unusual, irregular and suspect that additional security procedures were commercially reasonable and required.

368.    One of the additional security procedures that was commercially reasonable and required was for Wells Fargo wire department or another appropriate department to make a telephone call to BNY Mellon or its clearing house Pershing Clearing LLC to determine the validity of the wire transaction.  Wells Fargo made no such inquiry to either entity.

369.    If a telephone call was placed to the legitimate BNY Mellon or Pershing Clearing LLC to determine the validity of the wire transaction was made, Wells Fargo would have been advised of the fraudulent nature of the transaction, the transaction would not have occurred, and the Duncans would be in possession of their funds.

370.    Ordinary commercial prudence, especially with the knowledge of the banking industry and of Wells Fargo in particular, of the rampant use of wire fraud, required Wells Fargo to take additional security procedures including but not limited to the additional security procedures set forth above.

371.    Wells Fargo does not discuss its security procedures in the Wire Transfer Agreement which renders the Duncans incapable of consenting to its security procedures.

372.    Every contract or duty within the UCC imposes an obligation of good faith in it is performance or enforcement. UCC § 1-203.

373.    Where payment is erroneously directed to someone other than the intended beneficiary and the error would have been detected had the receiving bank complied with a security procedure, the sender is not obligated to pay the order. UCC § 4A-205.

374.    Payment was erroneously directed to someone other than the transfer's intended beneficiary, Pershing Clearing LLC.

375.    Had Wells Fargo complied with its security procedure, Wells Fargo would have found that the account to which the funds were sent was not in fact owned or controlled by Pershing Clearing LLC, and the error would have been prevented. Accordingly, the Duncans were not obligated to pay the order and are entitled to a refund from Wells Fargo.

376.    "If (i) the sender of an erroneous payment order described in subsection (a) is not obliged to pay all or part of the order, and (ii) the sender receives notification from the receiving bank that the order was accepted by the bank or that the sender's account was debited with respect to the order, the sender has a duty to exercise ordinary care, on the basis of information available to the sender, to discover the error with respect to the order and to advise the bank of the relevant facts within a reasonable time, not exceeding 90 days, after the bank's notification was received by the sender. If the bank proves that the sender failed to perform that duty, the sender is liable to the bank for the loss the bank proves it incurred as a result of the failure, but the liability of the sender may not exceed the amount of the sender's order." UCC § 4A-205(b).

377.    "If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply … If the beneficiary's bank pays the person identified by name or knows that the name and number identify different persons, no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer. If no person has rights as beneficiary, acceptance of the order cannot occur." UCC § 4A-207(b)(2).

378.    Wells Fargo misdescribed the sections labeled "Beneficiary/Recipient Information" and "Beneficiary Bank" on the outgoing wire transfer request. Wells Fargo Outgoing Wire Transfer Request (Exhibit K).

379.    Peters listed Pershing Clearing LLC in the section "Beneficiary/Recipient Name" when she should have listed Hal Duncan as the beneficiary with the correct BNY Mellon account number. Wells Fargo Wire Transfer Request. (Exhibit K).

380.    Peters also misdescribed the beneficiary bank as she listed Ameriabank as the beneficiary bank when she should have listed BNY Mellon as the beneficiary bank. Wells Fargo Outgoing Wire Transfer Request (Exhibit K).

381.    The funds were directed to go to BNY Mellon and the funds were not deposited into that account into which the Duncans had instructed.

382.    At no point did Peters call Ameriabank to confirm that the account number that was created was in fact in the name of the Duncans.

383.    "If the sender is a bank, the receiving bank may rely on a number as the proper identification of the intermediary or beneficiary's bank if the receiving bank, when it executes the sender's order, does not know that the name and number identify different persons. The receiving bank need not determine whether the name and number refer to the same person or whether the number refers to a bank. The sender is obliged to compensate the receiving bank for any loss and expenses incurred by the receiving bank as a result of its reliance on the number in executing or attempting to execute the order." UCC § 4A-208(b)(1).

384.    This provision clearly protects consumers, even commercial consumers, from bearing the burden of this type of bank error.

385.    "If the sender of a payment order that is erroneously executed as stated in Section 4A-303 receives notification from the receiving bank that the order was executed or that the sender's account was debited with respect to the order, the sender has a duty to exercise ordinary care to determine, on the basis of information available to the sender, that the order was

erroneously executed and to notify the bank of the relevant facts within a reasonable time not exceeding 90 days after the notification from the bank was received by the sender." UCC § 4A-304.

386.   Wells Fargo failed to use sufficient and adequate tools for its security procedures.

387.   Wells Fargo should have noticed that the website that the Duncans showed its employees was that of a spoofed website and that had it exercised its due diligence in actually examining the URL that was shown to its employees, Wells Fargo would have noticed that the website that the Duncans visited, bnymelloncdrates.com, was a spoofed website.

388.   Presented with multiple red flags sufficient to arouse the suspicion in the exercise of reasonable care, Wells Fargo had a duty to inquire further on behalf of the Duncans before initiating the wire transfer.

389.   "If a funds transfer is not completed … and an intermediary bank is obliged to refund payment … but is unable to do so because not permitted by applicable law … a sender in the funds transfer that executed a payment order in compliance with an instruction … to route the funds transfer through that intermediary bank is entitled to receive or retain payment from the sender of the payment order that it accepted. The first sender in the funds transfer that issued an instruction requiring routing through that intermediary bank is subrogated to the right of the bank that paid the intermediary bank to refund …."  UCC § 4A-402.

390.   Wells Fargo should be subrogated or "placed in the shoes of" Ameriabank as Wells Fargo was the first sender in the funds transfer that issued an instruction requiring routing of the Duncans funds through the Armenian bank known as Ameriabank.

391.   The provisions in the UCC provides for a heightened protection for its consumers.

392.   Interpreting Article 4A in a manner that would allow a bank to transfer funds when

it knows or should know that they were fraudulently obtained, would allow banks to use Article 4A as a shield for fraudulent activity which could hardly have been the intent of the drafters to enable a party to succeed in engaging in fraudulent activity, so long as it complied with the provisions of Article 4A.

393.     "The right of the sender of a payment order to be excused from the obligation to pay the order … or to receive refund … may not be varied by agreement." UCC § 4A-402(f).

394.     Wells Fargo's right to be excused from their payment obligation or to receive a refund may not vary their obligations by agreement.

395.     Thus, the Duncans should be entitled to a refund from Wells Fargo.

396.     Wells Fargo is liable to Plaintiffs, and Plaintiffs are entitled to relief in an amount to be determined by the court.

### COUNT IX
### (BREACH OF FIDUCIARY DUTY)
#### (Against Wells Fargo)

397.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows.

398.     To establish a prima facie case for breach of fiduciary duty, a plaintiff must prove (1) the existence of a fiduciary duty between the parties; (2) the breach of that duty; and (3) damages suffered as a result of the breach.

399.     A fiduciary duty arises when a customer reposes trust in a bank and relies on the bank for financial advice or in other special circumstances.

400.     A fiduciary relationship can be created between a bank and its customers when the customer reposes faith, confidence, and trust in a bank; when the borrower is in a position of inequality, dependence, weakness, or lack of knowledge; and the bank exercises dominion, control, or influence over the borrower's affairs.

401.    To plead claim of breach of fiduciary duty under New York law, plaintiff must allege both fiduciary relationship between parties and breach of duty implied in connection with such relationship.

402.    Unilateral trust or confidence does not automatically create fiduciary relationship under New York law; trust or confidence must be accepted as well.

403.    Banks are obligated under New York law to take reasonable steps to prevent misappropriation that investigation would have uncovered, when put on notice of a misappropriation of trust funds.

404.    In dealing with property of the principal, an agent shall observe the standard of care that would be observed by a prudent person dealing with property of another.

405.    A fiduciary relationship was created between Wells Fargo and the Duncans as the Duncans had placed their faith in the bank, the Duncans had a lack of knowledge regarding how wire transfers are performed; and Wells Fargo acting as the Duncans' agent had control of the wire transfer.

406.    At all relevant times, Wells Fargo owed fiduciary duties to the Duncans by virtue of the trust placed in Wells Fargo by the Duncans.

407.    The Duncans were entrusting Wells Fargo with $650,000, a significant amount of their live savings for retirement, and they trusted that Wells Fargo would properly transfer the funds to BNY Mellon as they had directed.

408.    The relationship of debtor and creditor between bank and depositor binds Wells Fargo to an implied contract under which it holds the deposit to be disbursed only in conformity with the customer's instruction and only upon the customers order.

409.    Wells Fargo's fiduciary duties to the Duncans also included a duty of utmost

loyalty, good faith and candor.

410.    As a fiduciary, Wells Fargo had a duty to refrain from taking actions detrimental to the Duncans' financial interests. As a result of the massive fraud perpetrated by the man who identified himself as "Barry Drucker," Wells Fargo breached its fiduciary duty owed to the Duncans.

411.    Wells Fargo owed a duty to execute the wire transfer pursuant to the written instructions it received from the Duncans.

412.    Wells Fargo failed to execute the wire transfer pursuant to the written wiring instructions it received from the Duncans.

413.    Wells Fargo, through the actions of Patterson and Peters, knew of and/or willfully disregarded their fiduciary duties by its repeatedly ignoring suspicious activity in violation of its own policies.

414.    Wells Fargo breached its fiduciary duty when it directed the Duncans funds to an account that was not maintained by BNY Mellon.

415.    As a direct and proximate result of Defendants breach of fiduciary duties, the Duncans have suffered substantial damages, the exact amount of which will be proven at trial, but which amount plainly exceed the jurisdictional minimum of this Court.

416.    Therefore, Wells Fargo had a fiduciary relationship which it breached through its conduct which acted as a substantial factor in causing the Duncans' damages.

417.    The conduct of Wells Fargo was gross, reckless and in bad faith or willful disregard of the Duncans' rights and interests.

## COUNT X
## (NEGLIGENT MISREPRESENTATION)
### (Against Wells Fargo)

418.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

419.    Negligent misrepresentation claim under New York law requires that: (1) defendant had duty, as result of special relationship, to give correct information; (2) defendant made false representation that he should have known was incorrect; (3) information supplied in representation was known by defendant to be desired by plaintiff for serious purpose; (4) plaintiff intended to rely and act upon it; and (5) plaintiff reasonably relied on it to his detriment.

420.    To succeed on claim of "negligent misrepresentation" under New York law, plaintiff must establish that defendant has duty to give correct information to plaintiff, and that defendant knew that information was desired by plaintiff for serious purpose, that plaintiff intended to rely and act upon it, and that, if false or erroneous, he or she would because of it be injured in person or property.

421.    Wells Fargo had a duty to give correct information to the Duncans as this duty was created by virtue of implied contract.

422.    An implied contract was created when the Duncans had instructed Wells Fargo to transfer the proceeds from their Wells Fargo account into an account maintained by BNY Mellon.

423.    The Wire transfer initiated on behalf of Wells Fargo's employees was not in conformity with the Duncans' instructions.

424.    A plaintiff must then show that the defendant knew: (1) that the information was desired by plaintiff for a serious purpose, (2) that the plaintiff intended to rely and act upon it, and (3) that, if false or erroneous, he or she would because of it be injured in person or property.

425.    The information was desired from the Duncans were for a serious purpose as they

wanted to make sure that a significant amount of their life savings wase transferred to the legitimate entity.

426.    The Duncans relied on Wells Fargo's experience in handling transfers of funds and dealing with legitimate transactions with legitimate entities.

427.    The Duncans would not have relied on Wells Fargo's expertise in confirming the legitimacy of the transaction had they known the Wells Fargo was not following proper protocol.

428.    The Duncans had also relied on a representation that Peters made that which was: "I feel very good about this. Everything is fine."

429.    This statement lulled the Duncans into a false sense of security.

430.    The statement that Peters made was false as everything was "not fine." If Peters had stated that everything was not fine, the Duncans would have relied on her statement and acted immediately to recoup their proceeds that were wired to the Armenian bank.

431.    Wells Fargo is liable to Plaintiffs, and Plaintiffs are entitled to relief in an amount to be determined by the court.

## COUNT XI
## VIOLATION OF CONSUMER PROTECTION LAWS
### (Against Wells Fargo)

432.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

433.    Deceptive acts or practice in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful. NY Gen. Bus. § 349 (McKinney 1970).

434.    Courts have an objective definition of deceptive acts and practices, whether representations or *omissions*, are limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances.

435.    Elderly person means a person who is sixty-five years of age or older. NY Gen. Bus. § 349-c(1) (McKinney 1970).

436.    In determining whether to impose a supplemental civil penalty … the court shall consider: (1) whether the defendant knew that the defendant's conduct was directed to one or more elderly persons or whether the defendant's conduct was in willful disregard of the rights of an elderly person; and (2) whether the defendant's conduct caused an elderly person or persons to suffer severe loss substantial loss of property set aside for retirement. NY Gen. Bus. § 349-c(2)(b)(1-2)(McKinney 1970).

437.    Enabling a customer to wire funds over to an account that it knows or should know was fraudulently set up is a deceptive practice as this practice is essentially ratifying the conduct of the person who set up the fraudulent transaction into believing that the transaction that they are performing is a legitimate transaction.

438.    Hal Duncan and Marsha Duncan fit the definition of elderly persons; Hal Duncan is sixty-eight years old and Marsha Duncan is sixty-five years old.

439.    Wells Fargo has known or should know that its clients are subject to scams which are directed toward elderly people and Wells Fargo's handling of the wire transfer was in willful disregard of the Duncans rights.

440.    Wells Fargo's conduct caused the Duncans to suffer a severe loss of $650,000 that they had set aside for retirement.

441.    BNY Mellon is liable to Plaintiffs, and Plaintiffs are entitled to relief in an amount to be determined by the court.

**COUNT XII**
**NEGLIGENCE**
**(Against BNY Mellon and Pershing LLC)**
*Failure to take down the spoofed website*

442.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

443.    BNY Mellon holds itself out as a sophisticated bank that employs experienced professionals with the requisite education and knowledge capable of handling secure wire transfers.

444.    The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension.

445.    At the time of the spoofing incident, BNY Mellon knew or had reason to know that there had been incidents of Web-site spoofing which placed its consumers and potential consumers at risk.

446.    BNY Mellon had an affirmative obligation to its customers and potential customers to prevent these individuals from being victims of fraudulent transactions as a result.

447.    The obligation that BNY Mellon had to its customers and potential customers was not passive in nature.

448.    In fact, BNY Mellon was alerted by the U.S. Department of the Treasury that it should survey the web periodically to ensure that the use of the domain does not pose an unacceptable risk to the bank or its customers. Alert 2000-9; *see also* https://www.occ.treas.gove/news-issuances/alerts/2000/alert-2000-9.html. (Exhibit V).

449.    BNY Mellon also was alerted that it can survey the web by using tools such as browsers to search for spoofed websites that are identical or closely identical to BNY Mellon. BNY Mellon could have checked the domains registries for registrations or domains that are

identical or closely identical to BNY Mellon. *Id.*

450.    Furthermore, the management of BNY Mellon had attended multiple seminars and conferences regarding cybersecurity training to prevent these types of occurrences from happening in the future. InfoSec Connect US, The Financial Services Cybersecurity Event, https://infosec.wbresearch.com/ (Exhibit Z).

451.    Since 2000, if not earlier, BNY Mellon had acknowledged that it and its customers were likely targets of website spoofing, a common scam in which criminals create a fake website that appears to be that of the bank in order to defraud consumers. Alert 2000-9; https://www.occ.treas.gov/news-issuances/alerts/2000/alert-2000-9.html; (Exhibit V); OCC Bulletin 2005-24. (Exhibit W); *Internet Security*, https://www.bnymellon.com/ca/en/internet-security.jsp (Exhibit AA); https://www.bnymellon.com/us/en/terms-of-use.jsp (Exhibit BB); FBI Public Service Announcement (PSA), *Business E-mail Compromise E-mail Account Compromise The 5 Billion Dollar Scam* (May 4, 2017) (Exhibit A); FBI PSA, Business *E-mail Compromise The 12 Billion Dollar Scam* (July 12, 2018) (Exhibit B).

452.    At the time of the subject incident, BNY Mellon knew or should have known that its name and/or trademarks were being used on "spoofed" websites to defraud customers and potential customers.

453.    The fraud at issue and the injury and harm it caused Plaintiffs was readily foreseeable, such that a duty of care may be imposed on BNY Mellon.

454.    As a sophisticated financial institution, BNY Mellon had a duty to warn reasonably identifiable victims of the known fraud being committed in its name and to take commercially reasonable steps to identify such offending websites and report them to the proper authorities or otherwise effect their removal. OCC Bulletin No. 2005-24 at 3. (Exhibit W).

455.    Furthermore, BNY Mellon, by virtue of its knowledge of the scam and its direct contact with Mr. Duncan on April 12, 2018, knew or should have known that the Duncans were the scam's latest target, and thus had a duty to share its superior knowledge or otherwise warn the Duncans.

456.    BNY Mellon breached its duty of care by failing to adopt commercially reasonable steps to prevent imitator websites from using its name and trademarks to commit fraud.

457.    BNY Mellon failed to mitigate its customers risk to web-site spoofing by implementing the identification and response procedures outlined in the publicly accessible OCC Bulletin. OCC Bulletin No. 2005-24; (Exhibit W).

458.    The Comptroller of the Currency in the United States Department of Treasury has provided a Bulletin to the Chief Executive Officers of All National banks to provide banks with guidance on how to respond to incidents of Web-site spoofing. OCC Bulletin 2005-24. (Exhibit W).

459.    The bulletin indicates that "Web-site spoofing is a method of creating fraudulent Web sites that look similar, if not identical, to an actual site, such as that of bank." *Id.*

460.    "Spoofing exposes a bank to strategic, operational, and reputational risks; jeopardizes the privacy of bank customers; and exposes banks and their customers to the risk of financial fraud." *Id.*

461.    "Banks can encourage customers and consumers to assist in the identification process by providing prominent links on their Web pages or telephone contact numbers through which customers and consumers can report phishing or other fraudulent activities." *Id*.

462.    BNY Mellon failed to encourage its customers and consumers to assist in the identification process and has not provided prominent links on its Web pages or telephone contact

numbers through which customers can report phishing or other fraudulent activities.

463.    "The information that is collected will help the bank identify and shut down the fraudulent Web site … In some cases, banks will require the assistance of information technology specialists or their service providers to obtain this information. *Id.*

464.    "The United States department of Treasury has provided a list of information that a bank can collect which includes:

- The means by which the bank became aware that it was target of a spoofing incident (e.g. report received through Web site, fax, telephone, etc.)

- Copies of any e-mails or documentation regarding other forms of communication (e.g. telephone calls, faxes, etc.) that were used to direct customers to the spoofed Web sites;

- Internet Protocol (IP) addresses for the spoofed Web sites along with identification of the companies associated with the IP addresses;

- Web-site addresses (universal resource locator) and the registration of the associated domain names for the spoofed site; and

- The geographic locations of the IP address (city, state and country)"
    *Id.*

465.    "To respond to spoofing incidents effectively, bank management should establish structured and consistent procedures. These procedures should be designed to close fraudulent Web sites, obtain identifying information from the spoofed Web site to protect customers, and preserve evidence that may be helpful in connection with any subsequent law enforcement investigations." OCC Bulletin 2005-24. (Exhibit W).

466.    BNY Mellon did not establish structured and consistent procedures to respond to spoofing incidents effectively.

467.    BNY Mellon did not develop effective procedures that were designed to close fraudulent Web sites.

468.    The Duncans would not have been defrauded had BNY Melon developed effective procedures to respond to spoofing incidents effectively.

469.    BNY Mellon failed to set up Google alerts or the like to be notified anytime its name "Bank of New York Mellon Corporation" or any variation of its name was used on the internet.

470.    BNY failed to set up a Google alerts or the like to be notified any URL similar to its own URL or otherwise containing "BNY," "Mellon," "Bank of New York" and/or other identified with its business and brand.

471.    As a direct and proximate result of BNY Mellon's negligence, Plaintiffs have suffered damages and are entitled to relief.

## COUNT XIII
## NEGLIGENCE
### (Against BNY Mellon and Pershing LLC)
### *Communicating with client to contact the Duncans assigned agent Barry Drucker*

472.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

473.    BNY Mellon also breached its duty of care insofar as it communicated with Plaintiffs but failed to warn them of the potential fraud, despite knowing of the scheme's existence and being apprised of sufficient facts to indicate Plaintiffs were being targeted.

474.    BNY Mellon failed to implement detection procedures to monitor the internet for illegal or unauthorized use of its bank's names and trademarks. BNY Mellon could have detected

spoofing by searching the internet for identifiers associated with the BNY Mellon name.

475.    Had BNY Mellon adopted an effective program, the Duncans would have never fallen victims to the scammer who created the spoofed website.

476.    BNY Mellon also failed to use readily available information-gathering procedures to collect information about the subject spoofing attack and enable it to respond appropriately thereto.

477.    Upon information and belief, at no point did BNY Mellon contact the Internet Service Provider that hosted the fraudulent website or demand that the website that the Duncans accessed be shutdown.

478.    The spoofed website was shut down approximately a week after the Duncans had visited the website.

479.    Upon information and belief, at no point did BNY Mellon contact the domain name registrar to demand the offending domain name be disabled.

480.    Upon information and belief, BNY Mellon did not contact the FBI, Secret Service, United States Postal Inspection Service, Federal Trade Commission or any other joint organization that receives information regarding information regarding spoofed websites to prevent the Duncans from visiting the spoofed website of its bank.

481.    According to the Federal Deposit Insurance Corporation ("FDIC"), to prevent customer confusion, reputation harm, fraud and legal disputes, bank management can employ a number of practices and techniques … Bank management may consider acquiring more than one domain name to retain control over the use of all similar names." Federal Deposit Insurance Corporation, *Bank Technology Bulletin*, November 8, 2000. (Exhibit CC).

482.    The FDIC advises that "there are specific actions that should be considered to

prevent internet-related fraudulent schemes which include:

- "Improving authentication methods and procedures to protect against the risk of user ID and password theft from customers through e-mail and other frauds;

- Reviewing and, if necessary, enhancing practices for protecting confidential customer data;

- Maintaining current Web site certificates and describing how customers can authenticate the financial institution's Web pages by checking the properties on a secure Web page;

- Monitoring accounts individually or in aggregate for unusual account activity such as address or phone number changes, a large or high volume of transfers, and unusual customer service requests;

- Monitoring for fraudulent Web sites using variations of the financial institution's name;

- Establishing a toll-free number for customers to verify requests for confidential information or to report suspicious e-mail messages; and

- Training customer service staff to refer customer concerns regarding suspicious e-mail request activity to security staff."

Federal Deposit Insurance Corporation, Financial Institution Letters, *Guidance on Safeguarding Customers Against E-mail and Internet-Related Fraudulent Schemes*, March 12, 2004, FIL-27-2004. (Exhibit DD).

483. A national bank shall file a Suspicious Activity Report when it detects a known or suspected violation of Federal law. 12 C.F.R. § 21.11.

484. BNY Mellon did not file a Suspicious Activity Report when it detected a known or suspected violation of Federal law.

485. BNY Mellon failed to rapidly notify law enforcement that it was the target of a

spoofed website which would have prevented consumers, including the Duncans, from accessing the spoofed website.

486.    As a direct and proximate result of BNY Mellon's negligence, Plaintiffs have suffered damages and are entitled to relief.

## COUNT XIV
## VIOLATION OF CONSUMER PROTECTION LAWS
### (Against BNY Mellon and Pershing LLC)

487.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

488.    Deceptive acts or *practices* in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful. NY Gen. Bus. § 349 (McKinney 1970).

489.    Courts have an objective definition of deceptive acts and practices, whether representations or *omissions*, are limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances.

490.    Elderly person means a person who is sixty-five years of age or older. NY Gen. Bus. § 349-c(1) (McKinney 1970).

491.    In determining … supplemental civil penalty …the court shall consider: (1) whether the defendant knew that the defendant's conduct was directed to … elderly persons or whether the defendant's conduct was in willful disregard of the rights of an elderly person; and (2) whether the defendant's conduct caused an elderly person or persons to suffer severe loss substantial loss of property set aside for retirement. NY Gen. Bus. § 349-c(2)(b)(1-2)(McKinney 1970).

492.    Allowing a spoofed website to remain as a valid URL through inaction is a

deceptive practice as this practice is essentially ratifying the conduct of the person who created the spoofed website and it misleads a BNY Mellon customers into believing that they are dealing with the BNY Mellon's legitimate website whereas BNY Mellon has the resources and personnel to take down the spoofed website in a timely manner.

493.   Hal Duncan and Marsha Duncan fit the definition of elderly persons as Hal Duncan is sixty-eight years old and Marsha Duncan is sixty-five years old.

494.   BNY Mellon knew or should have known that fraudsters would create fraudulent website to scam elderly people into believe these websites posing as BNY are legitimate websites.

495.   BNY Mellon's conduct was in willful disregard of the Duncans rights and interests, as BNY Mellon allowed the fraudulently created website to remain up on the internet.

496.   The failure of BNY Mellon to act caused the Duncans to suffer a loss of $650,000, which was set aside for their retirement.

497.   BNY Mellon is liable to Plaintiffs, and Plaintiffs are entitled to relief in an amount to be determined by the court.

WHEREFORE, Plaintiffs demand judgment against the Defendant, Wells Fargo, in the first through tenth counts in a sum which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction along with interest and attorney fees; Plaintiffs demand judgment against the Defendants, BNY Mellon and Pershing LLC, in the eleventh through

fourteenth counts in a sum which exceeds the jurisdictional limits of all lower courts which

would otherwise have jurisdiction along with interest and attorney fees.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated: Port Washington, NY
April 8, 2019

Respectfully submitted,

PARKER WAICHMAN LLP

By: <u>/s/  *Jay L. T. Breakstone*</u>
Jay L. T. Breakstone
jbreakstone@yourlawyer.com
Jerrold S. Parker
Dan C. Calvert          *(Pending Application Pro Hac Vice)*
Matthew W. Hinrichs  *(Pending Application Pro Hac Vice)*
*Attorneys for Plaintiffs*
6 Harbor Park Drive
Port Washington, NY 11050
(516) 466-6500
(516) 723-4713 [fax]
Our File No.: 8009333